**Robert L. BROWN, suing on behalf of himself and all persons similarly situated, Plaintiffs,**

v.

**Perry MENDEL, Defendant.**

Civ. A. No. 90–A–1268–N.

United States District Court, M.D. Alabama, Northern Division.

Sept. 7, 1994.

James L. North, J. Timothy Francis, James L. North & Associates, John W. Haley, Alex W. Newton, Hare, Wynn, Newell & Newton, Birmingham, AL, for plaintiff.

Bobby Lee Cook, Cook & Palmour, Summerville, GA, Richard J. Morvillo, Court E. Golumbic, Pamela J. Hicks, Richardson, Berlin & Morvillo, Washington, DC, John M. Bolton, III, David B. Byrne, Jr., Robison & Belser, P.A., Montgomery, AL, for defendant.

## MEMORANDUM OPINION

ALBRITTON, District Judge.

## I. INTRODUCTION

Plaintiff, Robert Brown ("Brown"), filed this class action on May 12, 1992. This cause is now before the court on the Motion for Summary Judgment filed by Defendant, Perry Mendel ("Mendel") on June 10, 1994.

In October 1989, Kinder–Care, Inc. ("KCI") owned 87% of the common stock of its subsidiary, Kinder–Care Learning Centers, Inc. ("KCLC"). Brown alleges that he and other members of the class, shareholders of KCI, purchased common stock in KCLC pursuant to the October 4, 1989 issuance by KCI to its shareholders of rights to purchase 39,825,960 shares of KCLC (the "Rights Offering") owned by KCI. In connection with the Rights Offering, KCI prepared and disseminated to its shareholders a Prospectus dated October 4, 1989. Brown alleges that this Prospectus omitted material facts in violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and SEC Rule 10b–5 promulgated thereunder and that consequently, he and other members of the class were defrauded.

Brown originally sued The Enstar Group, Inc., the corporate successor to KCI, and Richard J. Grassgreen in addition to Mendel. Following bankruptcies by Enstar and Grassgreen, Brown dismissed his claims against those defendants and proceeded against Mendel alone. Brown contends that Mendel is secondarily liable under § 20(a) of the Securities Exchange Act of 1934 for the issuance of the Prospectus because he was a "controlling person" of KCI. In addition to these grounds, Brown alleges Mendel committed common law fraud and violated sections of the Alabama Code.[1]

On the other hand, Mendel contends that he was not a "controlling person" for purposes of secondary liability under the Securities Exchange Act. Additionally, he claims that the issuers of the Prospectus did not omit material information in violation of Section 10(b) of the Exchange Act. Finally, he asserts he did not violate Alabama law.

Because the court holds that the facts cannot legally support a finding that Mendel was a "controlling person" of KCI at the time the Prospectus was issued, and because the evidence does not show any personal fraud on Brown by Mendel, the court finds that Mendel's Motion for Summary Judgment is due to be Granted.

## II. FACTS

The court has carefully considered all affidavits, deposition excerpts, and documents submitted in support of and in opposition to the motion. The submissions establish the following facts:

Mendel founded what eventually became KCI more than twenty years ago. The company initially specialized in operating child-care centers. In addition to being the founder of KCI, Mendel served as KCI's President from 1970 until October 10, 1985, when he became Chairman of the Board. KCI expanded its holdings far beyond child-care. By the end of 1987, KCI provided child day care, educational, specialty retail, insurance, financial and related services through its subsidiaries.

---

1. This court has certified Brown's federal securities claims as a class action, but has denied class certification of Brown's common law and state statutory claims.

In 1987, KCI established KCLC as a wholly-owned subsidiary which ran the child care services operations. In addition to his positions as Chairman of the Board, Chief Executive Officer and Director of KCI, Mendel undertook the responsibilities of Chairman of KCLC's Board of Directors upon its formation.

Following advice from investment bankers that a separation of the businesses would improve the ability of both corporations to obtain financing, the management of KCI began to plan the spin-off of KCLC into a separate public company as early as 1987. In August 1988, KCI caused KCLC to conduct a public offering of common stock. Consequently, KCI's ownership of KCLC was reduced to 87%. KCI abandoned temporarily its plans for the spin-off. It was not until 1989 that KCI resumed planning for the spin-off of KCLC. The KCI Board of Directors held several meetings in April and May of 1989 to discuss various restructuring proposals. The Board adopted a plan on May 26, 1989. On May 29, 1989, KCI issued a press release announcing a corporate restructuring which would separate KCLC from KCI completely.

This restructuring plan called for the creation of separate boards of directors for KCI and KCLC. KCI would offer its shareholders the right to purchase 28 million newly issued shares of KCI common stock. The Lodestar Group ("Lodestar"), an investment bank, would purchase any of these shares which were not purchased in the rights offering. Lodestar would also purchase shares of KCLC. In the next phase of the restructuring plan, KCI would distribute shares of KCLC to existing KCI stockholders in the form of a tax-free dividend.

Effective May 29, 1989, Mendel resigned from the Board of KCI and focused on his duties as Chief Executive Officer of KCLC. Richard Grassgreen, who had served as a director since 1970 and as president since 1985, took over as KCI's Chairman of the Board. Additionally, other officers and directors were shuffled to effectuate a complete separation of the management of KCI and KCLC. For example, Eddie O. Nabors ("Nabors"), once executive vice-president and chief financial officer of both KCI and KCLC, became executive vice-president, chief financial officer and treasurer of KCLC only effective May 26, 1989. The undisputed affidavits of both Mendel and Nabors indicate that Mendel did not have close ties to anyone on the new KCI Board of Directors. After May 1989, KCI and KCLC were entirely separately run companies. Mendel was no longer an officer or director of KCI and owned only 2.6% of its stock.

In September 1989, KCI realized that the Internal Revenue Service would not give the restructuring plan a favorable ruling. KCI needed a new plan. The KCI board met on September 14, 1989 to discuss the problem, and Mendel attended this meeting by invitation as KCLC's Chairman. No new plan was adopted at this meeting. After this meeting, KCI decided to develop a new plan. KCI and KCLC each retained its own analysts for the purpose of obtaining a fairness opinion on the amended restructuring plan. At a subsequent meeting of the KCI Board of Directors to which Mendel was not invited and which he did not attend, the KCI Board of Directors approved an amended restructuring plan. Although Mendel and the rest of the KCLC Board of Directors approved this plan when it was presented to them by KCI, there is no evidence that Mendel participated in the development of this new plan. KCI announced publicly the amended restructuring plan on September 22, 1989.

By the terms of this new plan, KCI would offer 39,825,960 shares of KCLC stock to shareholders of KCI. For each share of KCI stock a shareholder owned, KCI would issue .7235 rights. Each whole right would entitle the holder to buy one share of KCLC stock at $4.75 per share. Lodestar agreed to buy the rest of KCI's shares of KCLC and to purchase any shares of KCLC not purchased in the Rights Offering.

On October 4, 1989, KCI issued a Prospectus to its shareholders regarding the amended restructuring plan. This Prospectus was prepared by KCI attorney Andrews. In Mendel's deposition, he testified that Andrews was around KCLC quite often working on the Prospectus. Mendel testified that it was his belief that Nabors, KCLC's chief

financial officer, was one of the KCLC employees involved in the creation of the Prospectus. Mendel testified that he was not personally involved in the preparation of the Prospectus, and Brown has offered no evidence to refute this.

On October 5, 1989, Mendel sent an informational letter to KCLC shareholders advising them of the Rights Offering being made to shareholders of KCI. Mendel enclosed a copy of the Prospectus with this letter and advised that KCLC was not asking its shareholders to do anything. According to the Mendel letter, KCI and KCLC prepared jointly the Prospectus containing information about the Rights Offering. On October 10, Grassgreen wrote KCI shareholders and informed them of their rights to purchase KCLC stock.

A short time after the restructuring was completed, KCI changed its name to The Enstar Group, Inc.

Brown and other KCI shareholders purchased KCLC shares pursuant to this Rights Offering and claim that numerous material facts were omitted from the Prospectus in violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5 promulgated thereunder by the Securities and Exchange Commission, 17 CFR § 240.10b–5. Plaintiffs allege omissions including the following information: the threat of write-downs and losses KCLC faced from its investments in junk bonds; the relationship between KCLC, KCI and Drexel Burnham Lambert ("Drexel"); the criminal activities of Drexel and its employee Michael Milken and the effect those activities would have both on the junk bond market and on the ability of KCI or KCLC to raise capital; and self-dealing by Mendel and Grassgreen. Plaintiff Brown's state law claims also arise out of the omissions.

### III. SUMMARY JUDGMENT STANDARD

■ Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). This standard can be met by the movant, in a case in which the ultimate burden of persuasion at trial rests on the nonmovant, either by submitting affirmative evidence negating an essential element of the nonmovant's claim, or by demonstrating that the nonmovant's evidence itself is insufficient to establish an essential element of his or her claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The burden then shifts to the nonmovant to make a showing sufficient to establish the existence of an essential element to his claims, and on which he bears the burden of proof at trial. *Id.* To satisfy this burden, the nonmovant cannot rest on the pleadings, but must by affidavit or other appropriate means, set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). The court's function in deciding a motion for summary judgment is to determine whether there exist genuine, material issues of fact to be tried, and if not, whether the movant is entitled to a judgment as a matter of law. It is the substantive law that identifies those facts which are material on motions for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). *See also DeLong Equip. Co. v. Washington Mills Abrasive Co.*, 887 F.2d 1499, 1505 (11th Cir.1989).

■ When the court considers a motion for summary judgment it must refrain from deciding any material factual issues. All the evidence and the inferences from the underlying facts must be viewed in the light most favorable to the nonmovant. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir.1990). *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The movant bears "the exacting burden of demonstrating that there is no dispute as to any material fact in the case." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir.1983). *See also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

With these rules and principles of law in mind, the court will determine whether sum-

mary judgment is appropriate or whether there exist genuine issues of material fact that should properly proceed to trial for resolution.

## IV. DISCUSSION

### A. Liability of Mendel Under the Federal Securities Exchange Act

Plaintiffs claim the Prospectus issued by KCI violated 15 U.S.C. § 78(b) and Rule 10b–5. Plaintiffs have not come forward with any evidence that Mendel was personally involved in drafting the allegedly fraudulent prospectus, but they contend that Mendel is liable for this violation by KCI because he was a "controlling person" of KCI under § 20(a) of the Securities Exchange Act. Defendant Mendel moves for summary judgment on the ground that as a matter of law he was not a "controlling person" of KCI at the time KCI issued the Prospectus. Defendant also claims that even if he were secondarily liable as a "controlling person" this motion should be granted because KCI did not violate the securities laws when it issued the Prospectus.

Section 20(a) of the 1934 Securities Exchange Act describes "controlling person" liability as follows:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). Due to the remedial nature of this statute, it should be liberally construed. *Myzel v. Fields*, 386 F.2d 718, 738 (8th Cir.1967). Brown's claim is that KCI (Enstar) was liable to him for securities fraud and that Mendel is secondarily liable for KCI's acts because he was a controlling person of KCI.

The Courts of Appeals have developed different standards to determine whether a defendant qualifies as a "controlling person." Some require a plaintiff to establish that the defendant had "actual authority to influence and direct the activities of the primary wrongdoer" and that the defendant was a "culpable participant" in the primary violation of the securities laws in order to establish § 20(a) liability. *See e.g. Lanza v. Drexel & Co.*, 479 F.2d 1277, 1299 (2d Cir.1973).[2] Other courts, including the Eighth Circuit, employ a different two-prong test to determine a defendant's liability under § 20(a):

> plaintiffs must establish, first, that the defendant ... actually participated in (i.e., exercised control over) the operations of the corporation in general; then he must prove that the defendant possessed the power to control the specific transaction or activity upon which the primary violation is predicated, but he need not prove that this latter power was exercised.

*Metge v. Baehler*, 762 F.2d 621, 631 (8th Cir.1985). *Accord, Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992).

Mendel contends that the plaintiff must meet the two-prong *Metge* test to establish controlling person liability, i.e., he must prove that in October 1989 Mendel actually participated in the operations of KCI in general, and that he also had the power to control the contents of the Prospectus. Brown contends that the first prong is not required in this circuit; that he does not have to come forward with any evidence of participation in the general operations of KCI, but only must produce evidence that Mendel had the power to control the contents of the Prospectus.

The Eleventh Circuit has settled some questions about § 20(a) liability. It adopted the definition of control offered by the Securities Exchange Commission. *Pharo v. Smith*, 621 F.2d 656, 670 (5th Cir.

---

**2.** This court does not find footnote 7 to the Eleventh Circuit's Opinion in *Rosen v. Cascade Int'l,* *Inc.*, 21 F.3d 1520, 1524–25 n. 7 (11th Cir.1994), to establish this requirement in this circuit.

1980) [3]. Therefore, in this context, control means

> the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.

*Id.* Furthermore, the plaintiff bears the burden of establishing that the defendant is a "controlling person" for the purposes of secondary liability under § 20(a). *See G.A. Thompson & Co. v. Partridge,* 636 F.2d 945, 958 (5th Cir.1981); *Binder v. Gordian Securities, Inc.,* 742 F.Supp. 663, 667 (N.D.Ga. 1990).

■ A defendant's liability as a "controlling person" depends on whether the defendant "had the requisite power to directly or indirectly control or influence corporate policy." *G.A. Thompson* at 958; *Binder* at 668. A defendant need not have exercised this power; possession of the power is enough to support a finding that the defendant was a "controlling person". *Binder* at 668. Thus, *G.A. Thompson* and *Binder* clearly provide that whether or not the defendant participated in the illegal activity is part of the defendant's affirmative defense, not the plaintiff's prima facie case. *G.A. Thompson* at 958; *Binder* at 668. But as *G.A. Thompson* noted, at that time the existing precedent in this circuit was "ambiguous" on the issue of whether a defendant must have "effective day-to-day control" of the company which is the primary violator to be liable as a "controlling person". *G.A. Thompson* at 958 n. 24.

Neither the *G.A. Thompson* court nor *Binder* court needed to decide whether effective day-to-day control of the company generally was a requisite to "controlling person" liability. In those cases, it was clear that the alleged "controlling person" had effective day-to-day control of the company which had violated the securities laws. In *G.A. Thompson,* the defendant was an officer, director and 24% shareholder of the company. *G.A. Thompson* at 949. He was also apparently involved in the day-to-day administration of the company. *Id.* at 958. These factors satisfied the court that the evidence estab-

lished this defendant was a "controlling person". *Id.* Similarly, the *Binder* court found the "controlling person" standard met by a defendant who was vice-president of the offending company, president and 33% shareholder of a sister company, and "fully capable of apprising himself of any of [the company's] business dealings, including the [offending] transactions." *Binder v. Gordian Securities, Inc.,* 742 F.Supp. 663, 668 (N.D.Ga.1990).

The Eleventh Circuit has not itself addressed the question of whether proof of general control of the primary violator is necessary to establish controlling person liability. The Fifth Circuit has. And, while it is not binding authority, the Fifth Circuit's post 1981 interpretation of its binding decision in *G.A. Thompson* and its requirements for "controlling person" liability is persuasive.

In *Abbott v. Equity Group, Inc.,* 2 F.3d 613 (5th Cir.1993), the Fifth Circuit decided that in addition to requiring a plaintiff to show that the defendant had the requisite control over the specific corporate policy which had resulted in the primary liability a plaintiff also had to show general control over the entity primarily liable. *Id.* at 620. Investors in a Louisiana partnership sued the partnership for misrepresentations and omissions in a Private Placement Memorandum which allegedly violated federal securities laws. *Id.* at 618. Investors also sued the surety and the bonding agent as secondarily-liable "controlling persons". *Id.* The Fifth Circuit rejected "controlling person" liability for the surety and the bonding agent and affirmed summary judgment in their favor. *Id.* at 621. This decision was premised on the fact that these defendants had no involvement with nor control over the general operations of the company primarily liable for the securities violation. *Id.* at 620. The plaintiffs failed to make the required "separate showing of control over the controlled entity" because the evidence did not show that the surety and the bonding agent had "power to control the general affairs of [the company primarily liable for the violation]." *Id.*

---

**3.** Decisions of the Fifth Circuit prior to October 1, 1981 are binding in the Eleventh Circuit.

*Bonner v. City of Prichard, Ala.,* 661 F.2d 1206, 1210 (11th Cir.1981).

Plaintiff's evidence that these defendants had control or influence over the specific transaction was an insufficient basis for "controlling person" liability. *Id.* at 620–621.

The Abbott court did not specifically adopt the first prong of the *Metge* test, but cited its earlier opinion in *Dennis v. General Imaging, Inc.*, 918 F.2d 496 (5th Cir.1990) as interpreting *G.A. Thompson* to require a plaintiff, for a prima facie case, to show "actual power or influence over the controlled person." *Id.* at 620. The court went on to say:

> *Dennis* is consistent with *Metge* to the extent that both require a separate showing of control over the controlled entity (Equity); but appellants insist that our circuit only requires that they show Home and Graham's power to control Equity, not the actual exercise of that power. We need not presently analyze the above distinction because, even assuming that only the former applies, a reasonable jury could not so find based on the record before us. *Id.* at 620.

Thus, the Fifth Circuit requires proof of at least the *power* to control the general operations of the controlled entity, even if possibly not the *exercise* of that power.

In light of these holdings and in the absence of any authority to the contrary, this court finds that these things must be proved in order to establish that the defendant was a "controlling person" for purposes of § 20(a): First, a plaintiff must show that the defendant had the power to control the general affairs of the entity primarily liable at the time the entity violated the securities laws. Second, a plaintiff must show that the defendant had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability. Finally, plaintiff must be able to establish the fact that the controlled entity violated the securities laws. If a plaintiff can show that the defendant meets these requirements, the defendant will be held liable as a "controlling person" unless he can show either lack of participation or good faith which are the affirmative defenses.

In his complaint, Brown alleged that Mendel was a "controlling person" of KCI in October 1989, when the Prospectus was issued, because of his position as Chairman of the Board of Enstar (KCI), his ability to control or direct the affairs of Enstar and its affiliates, his stock ownership in Enstar, his close ties with Defendant Grassgreen and his on-going access to material inside information about Enstar, and his activities. Brown now concedes that Mendel was no longer an officer, director, or employee of KCI, much less Chairman of the Board, in October, but contends that several other factors still establish Mendel's control over the policies of KCI. First, plaintiffs point to the long history of Mendel's involvement with KCI. Specifically, plaintiffs argue that Mendel, the long-time head of KCI, master-minded the restructuring of KCI and should not be allowed to escape liability for his plans because he resigned from his positions of power with KCI before KCI issued the Prospectus. But, plaintiffs do not base their claim on any alleged fraud in the restructuring, only on alleged fraud relating to the Prospectus. Second, plaintiffs contend that Mendel continued to enjoy control and influence over KCI after his resignation on May 26, 1989. Plaintiffs pin this argument on three facts: Mendel's position as head of KCLC which had to approve the amended restructuring, Mendel's presence at the September 14, 1989 meeting of the Board of Directors of KCI where the need for an amended restructuring plan was discussed, and the fact that a letter from Mendel to KCLC shareholders included a copy of the Prospectus and referred to the Prospectus as having been jointly prepared by KCI and KCLC.

The issue for this court is whether a reasonable jury could find that any or all of these facts are enough to establish that Mendel was a "controlling person" of KCI at the time KCI issued the Prospectus which allegedly violates federal securities laws. In other words, would these facts allow a reasonable jury to conclude that Mendel could influence generally the corporate policies of KCI at the time it issued the Prospectus and that Mendel had the requisite power to directly or indirectly control or influence the issuing of the Prospectus itself.

It appears from the facts that Mendel may have had some power of indirect control or influence over the contents of the Prospectus, although there is no evidence that he exercised it, but this alone does not make him a "controlling person" of KCI. Mendel's October 5, 1989 letter to KCLC stockholders does refer to the fact that KCI and KCLC jointly prepared the Prospectus. The evidence also indicates that KCLC employees like Nabors helped draft the Prospectus. As Chief Executive Officer and Chairman of the Board of KCLC, Mendel was in a position to control KCLC and its employees to some extent. This might allow a reasonable jury to conclude that Mendel had "control" as it has been defined in *G.A. Thompson* over the Prospectus.

However, the facts do not establish a genuine issue of material fact about Mendel's liability as a "controlling person" because he lacked the requisite control over the general affairs of KCI when it issued the Prospectus. At the time KCI issued the Prospectus, Mendel was neither a director, an officer, nor an employee of KCI. He had surrendered his power months before. Mendel offered uncontested proof that he did not have close ties to the new KCI Board of Directors. The history of the restructuring plan provides no evidence that Mendel had the requisite control over KCI. Mendel may have planned a restructuring of the companies before the end of his tenure as head of KCI, but it was a far different restructuring than the plan eventually enacted by KCI after his departure. The restructuring Mendel had envisioned would have distributed KCLC stock to KCI shareholders in the form of a tax-free dividend after a sale of new KCI stock; the amended restructuring plan offered KCI shareholders a chance to purchase KCLC stock. Furthermore, after Mendel's resignation he was only allowed to attend one meeting of the KCI Board of Directors, and this was not the meeting at which the KCI Board of Directors voted on the amended restructuring plan. Mendel owned only 2.6% of the KCI stock which was not enough to give him any general authority over KCI's operations. Plaintiffs submitted no evidence to support the allegation that Mendel had close ties to Grassgreen and access to material inside information about Enstar (KCI) in October. To the contrary, the evidence before the court shows that these ties were no longer close and that Mendel was involved with the child care business of KCLC and no longer with the unrelated businesses of KCI. Plaintiffs have simply submitted no evidence which could be construed as establishing power of Mendel in October 1989 to control the general affairs of KCI. Thus, the only reasonable conclusion based on the facts before the court is that Mendel lacked influence or control over the day-to-day operations of KCI after his resignation as an officer and director of that corporation in May 1989. Therefore, plaintiffs cannot establish the first requirement for controlling person liability.

Because this court finds that the evidence viewed in the light most favorable to the plaintiff fails to establish a question of fact as to Mendel's liability as a "controlling person" of KCI, summary judgment is due to be granted for Mendel on the federal securities law claims of Count One. This court finds it unnecessary to, and therefore does not, decide if the Prospectus violated the federal securities laws.

## B. State Law Fraud Claims

■ Brown alleges the Prospectus omits material facts. This he contends amounts to common law fraud and violates two sections of the Code of Alabama. Mendel denies that he committed any fraud on Brown. He also contends that the facts omitted were not material and that Brown's reliance upon the Prospectus was not reasonable.

Count Three of Brown's complaint alleges Mendel violated Section 6–5–102 of Code of Alabama which defines a form of fraud. Under this code provision, "[s]uppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case." Ala.Code § 6–5–102 (1993). This section of the Code of Alabama is "a codification of the common law." *Jim Short Ford Sales, Inc. v. Washington,* 384 So.2d 83, 86 (Ala. 1980). The requisite elements of fraud by

suppression include: "1) the suppression of a material fact 2) that the defendant was under a duty to communicate 3) either because of a confidential relation between the plaintiff and the defendant or because of the particular circumstances of the case." *Crowder v. Memory Hill Gardens, Inc.*, 516 So.2d 602, 604 (Ala.1987).

Brown also bases Count Three on Section 6–5–104 of the Code of Alabama which defines fraudulent deceit. It states that "[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk is liable for any damage which he thereby suffers." Ala.Code § 6–5–104(a). One of the meanings of the word "deceit" for purposes of this statutory provision is "[t]he suppression of a fact by one who is bound to disclose it or who gives information of other facts which are likely to mislead for want of communication of that fact." Ala.Code § 6–5–104(b)(3) (1993).

This claim, which is personal to Brown and which has not been certified for class treatment, is not based on a "controlling person" theory; it alleges that Mendel personally committed fraud on Brown on the basis of fraudulent omissions from the Prospectus. Brown offers no evidence of any fact which would establish that Mendel was personally involved in deciding on the contents of the Prospectus or that he had a duty to communicate anything to Brown at the time the Prospectus was issued. As previously discussed, Mendel was no longer in a position of control of KCI when it issued the Prospectus. KCI may have been under a duty to communicate material facts to Brown about the stock he was offered, but Mendel did not share that duty. There is no evidence nor any allegation that Mendel ever communicated with Brown. In light of these facts, no reasonable jury could find that Mendel is liable for fraud under the laws of Alabama. Summary judgment on Count Three is due to be Granted.

## V. CONCLUSION

The plaintiffs in this case were shareholders of KCI (later Enstar) who purchased shares of common stock of KCI's subsidiary, KCLC. The stock was purchased for $4.75 per share pursuant to a Rights Offering issued by KCI to its shareholders in October 1989. Plaintiffs claim that the Prospectus issued by KCI with the rights offering fraudulently omitted material information which, if included, would have caused them not to buy the stock. They further claim that the stock was actually worth far less than they paid for it.

In this action, plaintiffs first sued the corporation that issued the allegedly fraudulent Prospectus, KCI (Enstar) and its President and CEO Richard J. Grassgreen, along with Mendel. Plaintiffs dismissed their claims against Enstar and Grassgreen because those defendants went into bankruptcy. Their claim against Mendel alleged that he was Chairman of the Board of KCI at the time the Prospectus was issued, but they now concede that this was incorrect. Plaintiffs now argue, not that Mendel personally committed any fraud upon them, but that he can be held liable for the fraudulent acts of KCI because when the Prospectus was issued, he was a "controlling person" of KCI. The evidence before the court establishes, however, that at that time Mendel had completely severed all of his ties with KCI except ownership of 2.6% of its stock. He no longer had the power to control or influence the general operations of KCI. Therefore, no matter what wrongdoings Mendel may have committed at other times and to other persons or entities, he was not a "controlling person" of KCI when that corporation allegedly issued a fraudulent Prospectus to its shareholders, and he cannot be held liable for wrongful acts of that corporation or other persons which he did not commit himself.

A separate order will be entered granting summary judgment in favor of the defendant.

## ORDER

In accordance with the Memorandum Opinion entered on this day, it is hereby ORDERED that:

(1) Defendant Mendel's motion for summary judgment on Count One, the federal securities law claim, is GRANTED;

(2) Defendant Mendel's motion for summary judgment on Count Three, Brown's state law fraud claim, is GRANTED.

(3) Since Count Two was dismissed by previous order of the court, this disposes of the entire case and final judgment is hereby entered in favor of Defendant Mendel and against the plaintiffs, with costs taxed against the plaintiffs.