### III.  CONCLUSION

For all of the reasons stated above, we **REVERSE** the district court's decision that (1) denied Donnelly's and KeyBank's motion for judgment as a matter of law with respect to the claim of conspiracy to commit fraud, and (2) denied Elmore's motion for judgment as a matter of law with respect to the claims of fraud and of aiding and abetting fraud.  We also **REMAND** the case for a new trial on (1) the question of whether, in light of the information disclosed by Elmore to Black as Travelers's agent, Travelers established the element of justifiable reliance on Leahey's fraud regarding the surety bonds issued after the date of disclosure, and (2) the amount and allocation of damages to which Travelers is entitled in light of the rulings made throughout this opinion. In all other respects, we **AFFIRM** the judgment of the district court.

*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2000 FED App. 0227P (6th Cir.)
File Name:  00a0227p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

AETNA CASUALTY AND
SURETY COMPANY, n/k/a
TRAVELERS CASUALTY AND
SURETY COMPANY OF
AMERICA,
         *Plaintiff-Appellee/*
*Cross-Appellant (99-3005),*


         *v.*


LEAHEY CONSTRUCTION
COMPANY, INC., et al.,
                   *Defendants,*


KEYBANK NATIONAL
ASSOCIATION (OHIO) and
EDWARD DONNELLY,
         *Defendants-Appellants*
                   *(98-4545)/*
         *Cross-Appellees,*


MARK J. ELMORE and MARK
J. ELMORE, C.P.A., INC.,
         *Defendants-Appellees/*
*Cross-Appellants (99-3006).*

Nos. 98-4545;
99-3005/3006

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 97-01691—James S. Gwin, District Judge.

Argued:  April 27, 2000

Decided and Filed:  July 13, 2000

Before:  NORRIS and GILMAN, Circuit Judges; HOOD,
District Judge.

_____

**COUNSEL**

**ARGUED:**   Daniel R. Warren, THOMPSON, HINE &
FLORY, Cleveland, Ohio, for Appellant.  Mark H. Ludwig,
COLE COMPANY, Akron, Ohio, Timothy J. Fitzgerald,
GALLAGHER, SHARP, FULTON & NORMAN, Cleveland,
Ohio, for Appellees. **ON BRIEF:** Daniel R. Warren, Toni J.
Querry, Patrick F. Haggerty, THOMPSON, HINE & FLORY,
Cleveland, Ohio, for Appellant.  Mark H. Ludwig, COLE
COMPANY, Akron, Ohio, Timothy J. Fitzgerald, James F.
Koehler, GALLAGHER, SHARP, FULTON & NORMAN,
Cleveland, Ohio, for Appellees.

_____

**OPINION**

_____

   RONALD LEE GILMAN, Circuit Judge.  Aetna Casualty
and Surety Company, now known as Travelers Casualty and
Surety Company of America (Travelers), alleges that the
defendants engaged in a scheme to defraud Travelers in
connection with its issuance of certain surety bonds.

   * The Honorable Joseph M. Hood, United States District Judge for the
Eastern District of Kentucky, sitting by designation.

in, requests, aids, encourages, ratifies, or adopts a
wrongdoer's actions in pursuance of a common plan or design
to commit a tortious act." *Clevecon, Inc. v. Northeast Ohio
Reg'l Sewer Dist.*, 628 N.E.2d 143, 148 (Ohio Ct. App. 1993).
Tortfeasors will not generally be held jointly or severally
liable, however, where their independent, concurring acts
have caused distinct and separate injuries to the plaintiff, or
where some reasonable means of apportioning the damages is
evident. *See Williams v. Gragston*, 455 N.E.2d 1075, 1077
(Ohio Ct. App. 1982).

   Here, Travelers seeks to impose joint and several liability
between Donnelly and KeyBank on the one hand, and Elmore
on the other.  The problem with Travelers's argument is that
although each of the two sets of defendants can be considered
joint tortfeasors with Leahey, they cannot be considered joint
tortfeasors with *each other*.  With respect to Donnelly and
KeyBank, the jury found that they aided and abetting Leahey
in his fraud against Travelers.  (We have concluded that the
conspiracy verdict against them must be reversed.)  The jury
did *not* find, however, that Donnelly and KeyBank in any way
assisted *Elmore* in the negligent performance of his duties vis-
à-vis Travelers.  (We have concluded that the fraud and the
aiding and abetting verdicts against Elmore must be reversed.)
As such, they cannot be responsible for the damages assessed
against him.  Similarly, although the jury rendered a verdict
finding Elmore negligent, it did *not* find that he assisted
*Donnelly and KeyBank* in making the loan for which they
were found liable.  As such, he cannot be held responsible for
the damages assessed against them.

   There was simply no "common plan or design to commit a
tortious act" as between the two sets of defendants.  *See
Clevecon*, 628 N.E.2d at 148.  For this reason, we conclude
that the district court did not err in denying Travelers's
motion to impose joint and several liability.

### E. The district court did not err when it refused to impose joint and several liability

After the jury returned its verdict against Donnelly, KeyBank, and Elmore, Travelers filed a motion to impose joint and several liability for the cumulative total of $2,600,000. (As previously noted, the jury assessed damages against Donnelly and KeyBank in the amount of $1,040,000, and against Elmore in the amount of $1,560,000.) The district court summarily denied this motion.

In its cross-appeal, Travelers contends that "[t]he district court should have entered a judgment upon the jury's verdict making KeyBank, Donnelly and Elmore jointly and severally liable for the $2.6 million dollars caused by Leahey's fraud." It argues that "[b]ecause Donnelly was a co-conspirator in [Leahey's] scheme to defraud Travelers, and [Donnelly] and Elmore both aided and abetted that fraud, each of the defendants are jointly and severally liable to the full extent of any and all damages caused by Leahey's fraud."

In response, Donnelly and KeyBank assert that, to the extent Travelers seeks to impose joint and several liability between them and Elmore, its contention must be rejected. They maintain that (1) Donnelly and KeyBank did not conspire with Elmore and (2) the requirement that each defendant contribute to a single injury is not present. For his part, Elmore notes that he was not found liable for conspiring with Donnelly and KeyBank, and therefore cannot be held jointly and severally liable for the damages caused by them. We agree with the defendants' position that joint and several liability would be improper in this case.

"Joint and several liability implies that, where damages are caused by the joint acts of two or more persons, each defendant may be held liable for damages incurred jointly or severally." *Shoemaker v. Crawford*, 603 N.E.2d 1114, 1122 (Ohio Ct. App. 1991). Under Ohio law, "[a] 'joint tortfeasor' has been defined as one who actively participates, cooperates

Specifically, Travelers contends that Patrick Leahey, a principal owner of both Leahey Construction Company, Inc. (LCC) and Leahey General Contracting and Management Corporation (LGC&M), fraudulently manipulated the financial position of LGC&M for the purpose of inducing Travelers to agree to bond LGC&M's public construction projects. Travelers further claims that Leahey's personal banker, Edward Donnelly of KeyBank National Association (KeyBank), and Leahey's accountant, Mark J. Elmore of Mark J. Elmore, C.P.A., Inc., participated in the scheme. LGC&M subsequently defaulted on three bonded projects, causing Travelers to incur over $2.5 million in losses.

The jury returned a verdict against Donnelly and KeyBank for conspiracy to commit fraud and aiding and abetting fraud, and returned a verdict against Elmore and his firm for fraud, aiding and abetting fraud, and negligent misrepresentation. Travelers thereafter requested that the district court impose joint and several liability upon the defendants. The defendants, on the other hand, requested judgment in their favor as a matter of law or, alternatively, a new trial. All of these motions were denied by the district court. The parties now challenge those rulings.

For the reasons set forth below, we **REVERSE** the district court's decision that (1) denied Donnelly's and KeyBank's motion for judgment as a matter of law with respect to the claim of conspiracy to commit fraud, and (2) denied Elmore's motion for judgment as a matter of law with respect to the claims of fraud and of aiding and abetting fraud. We also **REMAND** the case for a new trial on (1) the question of whether, in light of the information disclosed by Elmore to David Black as Travelers's agent, Travelers established the element of justifiable reliance on Leahey's fraud regarding the surety bonds issued after the date of disclosure, and (2) the amount and allocation of damages to which Travelers is entitled in light of the rulings made throughout this opinion. In all other respects, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A. Factual background

#### 1. *Leahey's efforts to obtain bonding, and his representations regarding increased capitalization*

At all relevant times, Leahey and his wife Susan were the principal owners of LCC and LGC&M, two Ohio corporations. Leahey operated LCC primarily as a contractor of residential homes. In the spring of 1996, however, Leahey shifted his attention toward public construction projects, and formed LGC&M in April of 1996 for that purpose.

A public entity generally requires that its construction projects be bonded by a surety company to guarantee the performance of the contractor. Leahey therefore contacted Black, who for several years had provided Leahey with insurance coverage. Black was employed by the James B. Oswald Company, an insurance agency that, among other things, serves as an intermediary between contractors and surety companies. One of Black's contacts was Stanley Halliday, a Cleveland-based account manager with Travelers. Halliday's immediate superior at Travelers was Douglas Bender. After Black informed Halliday that Leahey "would be a good opportunity for us," Halliday, through Black, requested that Leahey provide various financial information to Travelers for a preliminary review.

On June 27, 1996, Halliday met with Black and Leahey. During the meeting, Halliday expressed concern with the level of LGC&M's capitalization. Halliday explained at trial as follows:

My first review of Mr. Leahey's financial statement was, we didn't feel he had the financial resources to support a bonding program. . . .

As a bonding company, we feel there is a commitment to an amount of both cash and what we call working capital,

*Consolidated Rail Corp.*, 130 F.3d 241, 245 (6th Cir. 1997) ("In Ohio, punitive damages are available in civil tort actions upon a finding of actual malice.") (citing *Edmondson v. Steelman*, 622 N.E.2d 661, 663 (Ohio Ct. App. 1992)). The Supreme Court of Ohio has held that actual malice may be demonstrated by showing (1) that state of mind under which a person's conduct is characterized by hatred, ill-will, or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm. *See Preston v. Murty*, 512 N.E.2d 1174, 1176 (Ohio 1987).

Here, although it was reasonable for the jury to infer knowledge of Leahey's wrongdoing for the purpose of returning a favorable verdict on Travelers's aiding and abetting claim against Donnelly and KeyBank, Travelers did not present enough "clear and convincing" evidence from which the jury could reasonably find actual malice on their part.

To the extent that Travelers sought punitive damages based on "aggravated or egregious fraud," such a theory could only have applied to Elmore, because he was the only defendant that the jury found liable for committing fraud. And because of our conclusion that Elmore was entitled to judgment as a matter of law on the issue of fraud (see Part II.A.7. above), this theory is now inapplicable to him as well.

Finally, we find nothing improper about the district court rendering judgment on the issue of punitive damages sua sponte. Although judgment as a matter of law is normally entered by a district court following a meritorious motion, it is "clearly within the court's power" to do so on its own initiative. *American & Foreign Ins. Co. v. General Elec. Co.*, 45 F.3d 135, 139 (6th Cir. 1995); *see also* FED. R. CIV. P. 50(a)(1).

did not have a chance to respond. As such, we find it inappropriate to consider Elmore's argument. *See United States v. Brannon*, 7 F.3d 516, 521 n.2 (6th Cir. 1993) (electing to not address certain arguments because they "were raised for the first time in the reply brief"); *United States v. Jerkins*, 871 F.2d 598, 602 n.3 (6th Cir. 1989) ("It is impermissible to mention an issue for the first time in a reply brief because the appellee then has no opportunity to respond.") (citation and internal quotations marks omitted). Moreover, this issue is moot in light of our conclusion, set forth in Part II.A.7. above, that the evidence does not support the jury's finding that Elmore engaged in fraud.

**D. The district court did not err when it ruled, sua sponte, that there was insufficient evidence presented by Travelers to support an award of punitive damages**

At the close of Travelers's case-in-chief, the district court ruled, sua sponte, that there was insufficient evidence presented by Travelers to support an award of punitive damages. In its cross-appeal, Travelers contends that the district court erred in ruling on the matter sua sponte and that, in any event, judgment should not have been entered because a jury could reasonably have found, based on the evidence presented, the requisite malice to sustain a punitive damages verdict. We disagree with Travelers's argument.

Punitive damages are not recoverable from a defendant under Ohio law unless "[t]he actions or omissions of that defendant demonstrate malice, aggravated or egregious fraud, oppression, or insult, or that defendant as principal or master authorized, participated in, or ratified actions or omissions of an agent or servant that so demonstrate." OHIO REV. CODE ANN. § 2315.21(B)(1). The burden was on Travelers to prove by clear and convincing evidence that it was entitled to such damages. *See id.* § 2315.21(D)(3). To the extent that Travelers sought punitive damages based on a showing of "malice," it had to prove *actual* malice. *See Springston v.*

which is current assets less current liabilities, and also net worth or invested capital in a company.

You need to run a construction business and there are a lot of reasons why we believe that – and I'm not going to bore you to death with that – but it's something pretty important. And we talked about that, and it's something that Dave Black knew and understood, and also [Leahey] knew and understood that he was going to have to change a little bit of his operating philosophy financially.

As a result of his concerns, Halliday inquired as to whether Leahey would be able to increase LGC&M's assets. Halliday testified that Leahey assured him that funds could be obtained from his father-in-law, Albert Bersticker:

[Leahey] made it very clear that his wife Susan Leahey was the daughter[] of a gentleman who's the CEO for Ferro Corporation, a Fortune 500 firm based in Cleveland. And that that gentleman had set up essentially a trust, a family type of trust that had quite a bit of liquid assets available to them to inject into [LGC&M], as needed.

And if you looked historically at their financial statements in the past, [Leahey] had loaned 200[-]300,000 dollars to the company when it needed it to get – you know, to provide it with some cash when there were shortfalls from time to time. So essentially he felt that that would be a good mechanism to fund the company.

At all relevant times, Bersticker also served as a director of KeyBank.

Because Halliday did not want the additional funds to be added to LGC&M in the form of a simple bank loan, he suggested a more secure arrangement:

[T]here is [an] option called subordinated debts. And that's kind of tricky, but what it is is [Leahey] would take this, personally their money that he owned and controlled personally through his trust, and would loan it to [LGC&M] and sign an agreement with [Travelers] that stated that that money was not to leave [LGC&M] ever, unless [Travelers] approved it to leave [LGC&M]. And that that money would be used in the day-to-day operations of business.

. . .

And at our meeting we all agreed after discussion that that was a route that was acceptable to [Leahey] and to Dave Black, and then to [Travelers], that we could conceivably establish a business relationship.

The parties agreed after further discussion that Leahey would, among other things, execute a subordination agreement with respect to a previously made loan of $162,100, and that he would personally loan an additional $275,000 to LGC&M that would also be subordinated to Travelers.

### 2.   *Leahey's $275,000 loan from KeyBank*

Despite Leahey's representations to Halliday that the source of the needed funds would be his family trust, Leahey, in early July of 1996, inquired of his personal banker, Donnelly, about the possibility of obtaining a traditional bank loan from KeyBank. Since 1991, Donnelly had processed several loans for Leahey, the majority of which were related to bonding requirements. Donnelly claimed at trial, however, that he did not understand the bonding business. The purpose of this particular loan, as a KeyBank document indicates, was "to obtain approval from a new Bonding Company." After KeyBank denied Leahey's request, Leahey proposed as an alternative that Bersticker personally guarantee the loan and that payment be due in thirty days.

made after Dr. Austin had completed his testimony and had left town, and (2) the testimony did not violate the district court's proscriptions because "[Dr. Austin] did not express opinions as to whether the bond underwriting by Travelers for the Leahey company was appropriate."

"Traditionally, this circuit has reviewed a district court's ruling regarding the admissibility of expert testimony under Rule 702 for an abuse of discretion." *Morales v. American Honda Motor Co.*, 151 F.3d 500, 514 (6th Cir. 1998). "In the context of an evidentiary ruling, abuse of discretion exists when the reviewing court is firmly convinced that a mistake has been made regarding admission of evidence." *Polk v. Yellow Freight Sys., Inc.*, 876 F.2d 527, 532 (6th Cir. 1989).

Travelers's procedural argument lacks merit. The motion to strike may have come too late, but the record indicates that Donnelly and KeyBank made several timely objections during the course of Dr. Austin's testimony. As such, there was no default by the defendants. *See Gora v. Costa*, 971 F.2d 1325, 1329 (7th Cir. 1992) (finding no default where the objecting party filed a motion in limine and readdressed the issues at trial during a sidebar). Although we find no default, we also find no merit in Donnelly's and KeyBank's argument that the district court abused its discretion. Dr. Austin's responses may have drifted into an area in which he does not have expertise, but a reading of the direct examination transcript indicates that this was incidental to the overall thrust of his testimony, which focused on his opinion of proper banking practices in detecting fraudulent activities. We are therefore not "firmly convinced" that the district court erred in its admissibility rulings regarding Dr. Austin's testimony.

### C.   **Elmore's challenge to the testimony of Travelers's fraud expert**

In his reply brief, Elmore questions the propriety of certain testimony by Travelers's fraud expert, Eric Kreuter. Because this issue was not raised in Elmore's initial brief, Travelers

within the banking industry in evaluating loan requests for commercial contractors for [the] purposes of detecting whether or not that contractor may be intending to defraud," he said:

I don't think there is any really standard procedure, other than to go through the information and use the professional background of the individuals you have pursuing it, either the private banker or somebody in the Commercial Credit Department to take a look at it and see whether there are certain indicia or certain flags that are raised by the various facts that are facing the commercial loan officer at the time the request is made.

Over Donnelly's and KeyBank's objection, Dr. Austin testified that a "flag" in this case would be the fact that, although the request was made for bonding purposes, it was only a thirty-day loan. Dr. Austin stated that this would be a concern because "[b]onding normally is a permanent capital source of funds." Then, again despite a timely objection, Dr. Austin commented as follows:

And that's the type of long term capital that *the bonding company wants*, in most cases. . . . And if it was going to be borrowed and placed into a firm, *you would expect* it to be there for a period of time, at least equal to the bonding period but maybe even longer than that, because it would show equity ownership of the firm by the person who was the contractor.

(Emphasis added.)

Donnelly and KeyBank maintain that the district court erred by allowing Dr. Austin to express his opinions on bond underwriting: "Dr. Austin, a *banking* expert, did not limit his testimony to banking matters. His testimony about what a *bonding company* 'wants' and 'would expect' lacks a reliable basis in the knowledge and experience of his discipline." (Emphasis added.) In response, Travelers asserts that (1) any objection was defaulted because a motion to strike was only

On July 24, 1996, Donnelly wrote a memorandum to Leahey containing the details of the loan that KeyBank was prepared to make. In its original form, the document indicated that the amount would be a $175,000 loan to LCC, payment would be due in thirty days, there would be a $250 fee, and Bersticker would be the guarantor. The memorandum also stated as follows:

The funds are being used to increase the bonding capacity of [LCC]. You have been advised by the bonding agent to deposit these funds into [LCC]'s checking account. You need these funds to be there at month-end.

Functionally, we can deposit the funds for you into the account on July 29 and at your instructions, withdraw the funds from the account on August 2 and repay the loan. Once the loan has been repaid, the loan and guarantee will be canceled.

After Leahey received the memorandum, he returned it to Donnelly with several changes. Among other things, he noted that the loan amount should be listed as $275,000 instead of $175,000, that the entity to receive the benefit of the funds would be LGC&M rather than LCC, and that the "month-end" would be "July 96." Leahey also wrote, next to the thirty-day term, "5 day actual [illegible] guarantee by Mr. Bersticker." He then wrote the following note to Donnelly at the bottom of the sheet: "Please re-write this memo for presentation to [Bersticker]. He has no problem w[ith] this. However, I need [a] pledge form for [Bersticker] to sign by Friday as he will be traveling for 3 ½ weeks in Europe."

Although the loan had to be approved by George Storar, a credit manager at KeyBank, Donnelly never informed him of the four-day repayment term as outlined in the July 24, 1996 memorandum. The loan was approved by KeyBank. Accordingly, on July 29, 1996, $275,000 was deposited into

LGC&M's checking account and, on August 2, 1996, the same amount was transferred back to KeyBank.

### 3. *LGC&M's July 31, 1996 bank statement and Leahey's August 8, 1996 subordination agreement*

During the first week of August of 1996, Halliday requested, through Black, a copy of LGC&M's bank statement for the month ending July 31, 1996. Black provided Halliday with a copy, which showed that on July 29, 1996 the account was "credited" $275,000 and "debited" $250. No description is provided on the statement indicating the source of the credited funds or the reason for the debit. LGC&M's ending balance for the month was approximately $294,500. At trial, the parties stipulated that neither Donnelly nor any other representative of KeyBank ever made any verbal or written representations to Travelers with respect to the financial condition of Leahey or LGC&M.

On August 8, 1996, Leahey, consistent with the agreement reached during the June 27, 1996 meeting with Halliday and Black, executed a contract in which Leahey agreed to subordinate to Travelers his interest in certain monies that he had purportedly loaned to LGC&M. The two notes listed in the agreement were the $162,100 loan dated April 5, 1996 and the $275,000 loan dated July 29, 1996. At least with respect to the $275,000 loan, however, this subordination agreement had no effect because LGC&M's possession of those funds had ended six days earlier when the loan was repaid.

### 4. *Elmore's involvement*

Leahey first met Elmore in February of 1996. In March of that year, Leahey hired him to serve as an independent accountant for LCC and LGC&M. (For the remainder of this opinion, references to "Elmore" will include his firm.) As part of that role, Leahey requested Elmore to, among other things, conduct a "review" of LCC's and LGC&M's financial

Here, the defendants do not assign error to the district court's proximate causation instructions. The evidence at trial established that but for the $275,000 loan, Travelers would not have done business with Leahey. There was also sufficient evidence to support the jury's finding that, notwithstanding Travelers's alleged errors, the $275,000 loan produced, in a natural and continuous sequence, and all within a relatively short period of time, the resulting harm to Travelers.

We recognize that the concept of proximate cause requires more than "but for" causation. The other key considerations are reasonable foreseeability and the lack of any independent intervening causes. *See Westfield Ins. Co. v. Huls Am., Inc.*, 714 N.E.2d 934, 944 (Ohio App. Ct. 1998) ("In order to establish proximate cause, foreseeability must be found.") (citation and internal quotation marks omitted); *Queen City Terminals, Inc. v. General Am. Transp. Corp.*, 653 N.E.2d 661, 670 (Ohio 1995) ("We have long recognized that the connection between the defendant's act or omission and the damage or injury occasioned by the plaintiff may be broken by an intervening event."). The longer the gap between the making of the $275,000 loan and Travelers's decision to bond a job, and the more that other factors influenced Travelers's decisions regarding LGC&M, the more we would be inclined to agree with the defendants' argument that "Travelers's theory of causation is too attenuated as a matter of law." Based on the facts before us, however, we cannot say as a matter of law that proximate cause was lacking. Because reasonable minds might differ on that point, the question was properly put to the jury.

### B. The district court did not err in permitting certain testimony by Dr. Austin

Travelers's banking expert, Dr. Austin, opined that KeyBank's handling of the $275,000 loan transaction did not comply with generally accepted practices within the banking industry. In response to a question regarding "the practice

the "'public interest'") (quoting *United States v. Atkinson*, 297 U.S. 157, 160 (1936)).

### b. Proximate causation

The defendants also assert that Travelers's losses were not proximately caused by their conduct. Arguing that Travelers made underwriting misjudgments, they contend that "Travelers's theory of causation is too attenuated as a matter of law." Donnelly and KeyBank also maintain that even if the $275,000 had been kept in LGC&M's accounts, LGC&M would still have defaulted on its contracts and Travelers would therefore still have incurred losses. In response, Travelers asserts that "the evidence at trial adequately established proximate cause because, in the sequence of events, KeyBank's loan to Leahey was the factor that led to LGC&M's securing bonds from Travelers." We agree with Travelers's position.

With respect to proximate causation, the Supreme Court of Ohio has commented as follows:

The term, "proximate cause," is often difficult of exact definition as applied to the facts of a particular case. However, it is generally true that, where an original act is wrongful or negligent and in a natural and continuous sequence produces a result which would not have taken place without the act, proximate cause is established, and the fact that some other act unites with the original act to cause injury does not relieve the initial offender from liability.

*Clinger v. Duncan*, 141 N.E.2d 156, 162 (Ohio 1957). "In any case where there is a question upon which reasonable minds might differ as to the foreseeability of a particular risk or the character of an intervening cause, the question is one for submission to the jury under proper instructions as to proximate cause." *Ohio Fair Plan Underwriting Ass'n v. Arcara*, 417 N.E.2d 115, 120 (Ohio Ct. App. 1979).

statements as of June 30, 1996. (Elmore's practice did not involve audits.)

Elmore's role was discussed during the June 27, 1996 meeting between Halliday, Black, and Leahey. Halliday commented at trial as follows:

[A]t our meeting, [it was discussed that] [Leahey]'s financial reporting wasn't where we would like it to be for our standard commercial accounts, and that's not unusual either. With newer accounts you obviously have to discuss what your needs are as a surety, and whether he wants to fulfill them as a contractor. And [Leahey] had asked that I contact Mark Elmore and let him know the type and the form of financial information that he would need to present on behalf of [LGC&M].

As a result of Leahey's urging, Halliday contacted Elmore in late July or early August of 1996 to discuss the work that Elmore had been hired to perform for Leahey. Halliday gave the following testimony regarding the substance of his discussion with Elmore:

[T]he other thing we were going to talk about, is the loans that were being made. If you remember the date [of the loan] was July 29th, 1996, we were going to get a 6/30 statement from . . . Elmore, so that loan wasn't going to be reflected [on that statement].

And the other reason we were talking, I was going to ask [Elmore] to footnote that on such and such a date . . . [Leahey] had capitalized a loan to the company for $275,000 that had been subordinated to us and was in the company so that I knew that that money was there.

At trial, Elmore did not take issue with Halliday's account of this conversation.

On September 9, 1996, Elmore, in apparent response to Halliday's request, sent a letter to Black accompanied by

preliminary drafts of the June 30, 1996 balance sheets of LCC and LGC&M. Elmore understood that Black was an insurance agent assisting Leahey in his attempts to secure bonding. The letter's introductory text reads as follows:

Pursuant to our telephone discussion on Monday[,] September 9th, you will find below a summary of [LCC's and LGC&M's] anticipated balance sheets as of June 30, 1996. This office is currently in the process of reviewing the Companys' [sic] year end financial statements and I have not yet had the opportunity to review the workpapers to confirm their accuracy. I would anticipate providing your office with formal financial statements on or before September 20, 1996.

Although the balance sheet drafts provided by Elmore did not make reference to the $275,000 loan, Elmore discussed the borrowing in the concluding paragraph of his letter: "In addition to the above shareholder loans[,] Patrick Leahey also lent to [LGC&M] an additional $275,000 after June 30, 1996." When asked at trial as to what "sources" he relied on in drafting this particular information, Elmore said that he relied on statements by Halliday, Leahey, and Black, as well as on "a copy of a promissory note . . . for $275,000" that he had in his files. Despite the fact that Elmore understood that the information contained in the letter was to be used by Black for the purposes of helping Leahey secure bonding, and despite the fact that Elmore knew that Leahey had subordinated his rights in the money to Travelers, Elmore never requested nor reviewed LGC&M's August 31, 1996 bank statement, which would have revealed that the loan was no longer outstanding.

On September 20, 1996, Elmore again provided Black, via facsimile, with financial information on Leahey's companies. In Elmore's cover letter, he wrote as follows:

Enclosed are "draft copies" of [LCC's and LGC&M's] June 30, 1996 financial statements. I am still in the

necessary that the principal actually control the manner or means of the agent's activities. It is only necessary that the principal have the right to do so.

Over Donnelly's and KeyBank's timely objection, however, the district court declined to tell the jury that "[a] principal is charged with and bound by all knowledge obtained by his agent within the scope of his authority and in the course of his duties as an agent." The correctness of the defendants' justifiable reliance argument, therefore, turns on whether this omission constituted reversible error, and, if so, whether Elmore may benefit from it. We believe it did constitute reversible error, and that, in our discretion, Elmore may benefit on remand.

Although the jury instruction accurately set forth the basic principles of agency law, it failed to provide the jury with an essential piece of the puzzle—the practical effect that a finding of agency would have with respect to their decision on justifiable reliance. As such, a new trial is required as to that issue. *See Jones v. Federated Financial Reserve Corp.*, 144 F.3d 961, 966-67 (6th Cir. 1998) (remanding for a new trial in part because the district court rejected the appellant's request for a jury instruction that would have imputed liability to a principal party).

"Plain error is an 'obvious and prejudicial' error that requires action by the reviewing court 'in the interests of justice.'" *Reynolds v. Green*, 184 F.3d 589, 594 (6th Cir. 1999) (citation omitted). Whether the district court's error in failing to properly instruct the jury on the law of agency constituted an "obvious and prejudicial" error requiring action "in the interests of justice" is a close question. Because a new trial on this issue will be required anyway as to Donnelly and KeyBank, however, we believe that the interests of justice would be served by permitting Elmore to benefit from a retrial of this question. *See Platis v. Stockwell*, 630 F.2d 1202, 1206 (7th Cir. 1980) (noting that a court of appeals "has discretion to disregard Rule 51" especially when doing so would serve

agent's] authority." *Brown v. Christopher Inn Co.*, 344 N.E.2d 140, 143 (Ohio Ct. App. 1975).

Travelers's first argument in response to the defendants' justifiable reliance challenge is that Black was not acting within the scope of his authority when he learned that the $275,000 loan had been repaid just days after it was extended. We find this argument unpersuasive. The agency agreement between Travelers and the James B. Oswald Company in effect at the time gave Black, as an employee of the James B. Oswald Company, authority to act as Travelers's agent with respect to "[b]ond lines, including fidelity, fiduciary, surety and mail insurance." It also stated that Black was "authorized on [Travelers's] behalf to solicit, bind, execute and service policies and endorsements, for th[ose] lines of insurance . . . ." Thus, information indicating that Leahey might no longer be satisfying Travelers's bonding requirements was clearly related to matters within the scope of Black's authority.

Travelers second argument, positing that Black was "engaged in committing an independent fraudulent act on his own account," is equally unpersuasive. Because the issue of imputed knowledge was never presented to the jury, it was not given the opportunity to consider any exceptions that might apply.

With respect to the jury instruction that *was* delivered, the district court stated as follows:

In deciding whether [Travelers] justifiably relied on the statements or failures to disclose, you may consider whether David Black, employed by the J.B. Oswald Company, acted as an agent of Travelers.

A person is an agent of another, called the principal, when the principal has given the agent the authority to act on the principal's behalf, and the principal has retained the right to control the manner or means of performing that act. For a person to be an agent, it is not

process of finalizing these statements and will provide your office with the final financial statements results as soon as possible. Again, Patrick Leahey did loan to [LGC&M] an additional $275,000 after June 30, 1996, which has not yet been disclosed as a subsequent event on the financial statement.

### 5.    *Elmore learns of the loan repayment*

Within a week of the September 20, 1996 facsimile, Elmore discovered that the $275,000 loan had actually been repaid on August 2, 1996. (In its opinion and order dated August 14, 1998, the district court noted that the discovery was made when Elmore's assistant, Jim Ashworth, was finalizing the June 30, 1996 financial statements.) As a result of this discovery, Elmore promptly contacted Black and informed him that LGC&M's June 30, 1996 financial statements would not include any reference to the $275,000 loan. When asked at trial why he did not also contact Halliday or Bender upon discovery of the repayment, Elmore said he believed that informing Black was sufficient: "When I told Dave Black I was telling [Travelers]."

On October 14, 1996, Elmore and Bender met to discuss various matters relating to LGC&M. (In late August of 1996, Halliday was promoted and transferred to Travelers's Omaha office. Bender, his supervisor at the time, assumed responsibility for Halliday's open accounts, including those related to LGC&M.) Bender did not ask about, nor did Elmore provide an update on, the $275,000 loan.

On October 25, 1996, Elmore mailed the final results of his review of LCC's and LGC&M's June 30, 1996 financial statements to Bender, Black, and Leahey. Neither the cover sheet nor the statements themselves made any reference to the $275,000 loan. Bender testified, however, that he did not receive Elmore's delivery until December of 1996. The testimony at trial indicated that although Elmore used the address listed on Bender's business card, the financial

statements may have been delivered to the wrong Travelers office.

When Bender was asked at trial what role the September 9, 1996 and September 20, 1996 documents from Elmore (indicating the presence of the $275,000 loan) played in his evaluation of one of the construction projects discussed, he answered as follows: "That was critical to me because, again, the whole financial basis of writing this account was this subordinated money that we have been talking about." He also stated, however, that when he finally received the June 30, 1996 financial statements and noticed that they did not include any reference to the $275,000 loan, he was not alarmed: "Frankly, it did not concern me."

### 6.    *Ranallo's involvement*

In late August of 1996, Leahey hired JoAnne Ranallo to serve as an in-house accountant for LCC and LGC&M. At trial, Ranallo testified that she prepared, among other things, the balance sheets for LGC&M as of December 31, 1996, February 12, 1997, and March 31, 1997, all of which she knew would be sent to Travelers. On each of these financial statements, Ranallo knowingly misstated certain balances. Notably, in each document she overstated the long-term notes payable by $425,000. The effect of this particular misstatement was to falsely indicate that, as of the above balance sheet dates, LGC&M owed Leahey $425,000. The $425,000 consisted of the July 29, 1996 loan for $275,000 and another loan in the amount of $150,000. This latter loan was also the result of a request by Travelers, but was never actually deposited into LGC&M's accounts. (Because we believe that the circumstances surrounding the $150,000 loan are cumulative to the $275,000 loan already detailed, we will not discuss it further.)

When Ranallo was asked at trial about who directed her to incorrectly state these balances, she indicated that it was Black who made the request "every time [the statements]

objections by the parties, and the appellant did not object at that time).

Under common law, a principal is chargeable with the knowledge of, or notice to, his agent that is received by the agent in the due course of his employment and is related to the matters within his authority. *See State ex rel. Nicodemus v. Industrial Comm'n*, 448 N.E.2d 1360, 1362 (Ohio 1983); *Finkle v. Western & S. Life Ins. Co.*, 172 N.E.2d 311, 321 (Ohio Ct. App. 1960) ("[T]he law is well settled that notice to the agent is notice to the principal."). As the Supreme Court of Ohio has explained, however, a principal will not be responsible for such knowledge or notice in certain circumstances:

> There is an exception to this rule when the agent is engaged in committing an independent fraudulent act on his own account, and the facts to be imputed relate to this fraudulent act. It is sometimes said that it cannot be presumed that an agent will communicate to his principal acts of fraud which he has committed on his own account in transacting the business of his principal, and that the doctrine of imputed knowledge rests upon a presumption that an agent will communicate to his principal whatever he knows concerning the business he is engaged in transacting as agent. . . . It has been suggested that the true reason for the exception is that an independent fraud committed by an agent on his own account is beyond the scope of his employment, and therefore knowledge of it, as matter of law, cannot be imputed to the principal, and the principal cannot be held responsible for it. . . . Whatever the reason may be, the exception is well established.

*American Export & Inland Coal Corp. v. Matthew Addy Co.*, 147 N.E. 89, 92-93 (Ohio 1925). In any case, "[a] party who claims that a principal is responsible for the acts of an employee is obligated to prove the agency and scope of [the

in the course and furtherance of a scheme to defraud is not imputed to the principal."

At the outset, we note that, with respect to Elmore, the district court's failure to instruct on imputed knowledge must be reviewed under the "plain error" standard. *See Reynolds v. Green*, 184 F.3d 589, 594 (6th Cir. 1999) (noting that a failure to object to a jury instruction may still be reviewed for "plain error"). After the district court instructed the jury, the parties were asked whether they had any objections. Elmore stated that "he has no exceptions to the instructions." Elmore now argues that "Travelers offers no support for its argument that both defendants must specifically object to a clearly erroneous jury charge."

Elmore, however, improperly places the burden on Travelers. He failed to request the imputed-knowledge instruction and has not asserted that the district court was aware of his dissatisfaction with the jury instructions as given. *See Preferred RX, Inc. v. American Prescription Plan, Inc.*, 46 F.3d 535, 547 (6th Cir. 1995) ("The law in this circuit generally requires a formal objection, which should in most circumstances be made both before and after the jury instructions are read to the jury. An exception to this rule occurs only when it is plainly apparent from the discussion between the parties and the judge that the judge was aware of a party's dissatisfaction with the instruction, as read to the jury, and the specific basis for that claimed error or omission."); *see also* FED. R. CIV. P. 51.

Elmore's further contention that any objection would have been futile is unpersuasive. Where, as here, the district court specifically asked the parties, immediately after delivering the jury instructions, whether they had any objections, an argument of futility will not stand. *See Cooper Distrib. Co. v. Amana Refrigeration, Inc.*, 180 F.3d 542, 550 (3d Cir. 1999) (rejecting a futility argument when, immediately after giving its instructions, the district court expressly invited any

were issued." She later referred to Black as "a representative of [Travelers] . . . ." Ranallo also testified that both Leahey and Elmore were aware of the situation:

Q. Did you ever have any conversations with Mr. Elmore concerning these financial statements we have just talked about?

A. I believe initially, yes.

Q. Did Mr. Elmore know that you were preparing financial statements that would misrepresent the financial condition of [LGC&M]?

A. Yes.

Q. Did you tell him you were doing so?

A. I told him I was instructed to do so.

Q. So he knew what you were doing?

A. Yes.

Q. And . . . Leahey knew what you were doing?

A. Yes.

During cross-examination, however, Ranallo acknowledged that Elmore did not assist her in preparing the financial statements. She also failed to state *when* she had these conversations with Elmore.

### 7. *Travelers issues surety bonds to LGC&M*

Travelers began its bonding activities for LGC&M in August of 1996, when it authorized, but eventually did not issue, a surety bond for a United States Post Office project. When Halliday was asked at trial to describe how the authorization was obtained, he responded as follows: "I

discussed it with . . . Bender, my direct manager, who did have that authority. And with my recommendation, we agreed to do that project based on the fact that [Leahey] had put in and subordinated to us $437,100."

The first actual issuance of a surety bond occurred on September 11, 1996 with respect to the Lakeland Community College project. Subsequent to that transaction, LGC&M defaulted on the following three construction projects for which Travelers had provided surety bonding: (1) Madison Waste Water Treatment Facility in the amount of $978,750, (2) University of Toledo in the amount of $3,700,000, and (3) Kirkham Place Limited Partnership in the amount of $1,111,547. Bonding in the amount of $1,000,000 for the Madison project was initially approved on September 20, 1996, but the "bond date" was November 8, 1996. The Toledo project bonding was approved on October 4, 1996, but the amount was not "submitted by the Principal to the Obligee" until October 7, 1996. Finally, Travelers approved the Kirkham Place bonding on February 20, 1997, which appears to have been the same date that the bonds became "effective." Travelers asserted at trial that but for the presence of the additional $275,000, it would not have issued surety bonds to LGC&M on any of these projects.

## B.  Procedural history

On June 23, 1997, Travelers filed a complaint against LCC, LGC&M, Leahey, and Leahey's wife Susan. Leahey and his wife, however, filed for bankruptcy in April and August of 1998, respectively. A default judgment in the approximate amount of $2,800,000 was entered against LCC and LGC&M on October 7, 1998, but it appears that neither entity had assets available to satisfy the judgment.

On December 2, 1997, Travelers filed an amended complaint, adding KeyBank, KeyCorp (KeyBank's parent corporation), Donnelly, Bersticker, and Elmore as defendants. Travelers asserted the following Ohio state law claims:

Under Ohio law, the elements of fraud are (1) a representation or, where there is a duty to disclose, concealment of a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury proximately caused by the reliance. *See Cohen v. Lamko, Inc.*, 462 N.E.2d 407, 409 (Ohio 1984). Donnelly, KeyBank, and Elmore focus their appeal on the last two elements.

### a.  Justifiable reliance

The defendants contend that they cannot be held liable for the losses incurred in connection with those projects bonded after Elmore informed Black that the $275,000 loan had actually been repaid. They further note that Ranallo testified that, as early as December 31, 1996, she was instructed by Black to falsely report the existence of the loan on the balance sheets of LGC&M. The defendants argue that Black's knowledge of the repayment should have been imputed to Travelers based on well-settled agency principles. They contend, therefore, that it was error for the district court to refuse to instruct the jury that knowledge obtained by an agent is chargeable to his principal.

In response to Elmore's appeal, Travelers's contends, and Elmore does not dispute, that Elmore failed to request an imputed-knowledge instruction. He also did not object to the jury instructions in general. With respect to Donnelly's and KeyBank's assertion, Travelers maintains that the facts of the case do not support the giving of such an instruction. First, it contends that Black's agency authority was too limited to permit imputation of such knowledge to the principal. Second, it claims that "[t]he evidence at trial established that Black was an active participant in the scheme by the Leaheys to defraud Travelers" and that "knowledge gained by an agent

### b.   Substantial assistance

Because we conclude that the jury's finding that Elmore knew of Leahey's tortious conduct is not supported by the evidence, we need not address Elmore's challenge to the sufficiency of the evidence supporting the substantial assistance prong.

### 7.   *Elmore's motion for judgment as a matter of law—fraud*

Elmore's motion for judgment as a matter of law was also directed at Travelers's claim that Elmore himself committed fraud. He basically repeats the contentions set forth in Part II.A.6. above, rather than focus on *his* alleged misrepresentations. However, for the reasons set forth in that Part (i.e., his lack of prior knowledge regarding Leahey's fraud), we conclude that the evidence does not support the jury's finding that Elmore himself engaged in fraud. The district court therefore erred in not granting Elmore's motion for judgment as a matter of law on this issue.

### 8.   *The defendants' motions for judgment as a matter of law—justifiable reliance and proximate causation with respect to Leahey's fraud*

With the exception of the independent claim of fraud levied against Elmore, all of the fraud-related causes of action in this case (i.e., the aiding and abetting and the conspiracy claims) are based on Leahey's dealings with Travelers. The defendants have never denied that Leahey's actions were fraudulent. Their motions for judgment as a matter of law, however, included arguments to the effect that the aiding and abetting and the conspiracy charges cannot stand because the underlying cause of action for Leahey's fraud lacked two essential elements: justifiable reliance and proximate causation. Although the district court denied the defendants' post-trial motions in their entirety, the December 11, 1998 order does not include any analysis of the justifiable reliance and proximate causation issues.

(1) fraud, aiding and abetting fraud, and conspiracy to commit fraud against KeyBank, KeyCorp, Donnelly, and Elmore, (2) negligence on the part of Elmore, (3) tortious interference with prospective business advantage against KeyBank, KeyCorp, and Donnelly, (4) tortious interference with contract against KeyBank, KeyCorp, and Donnelly, (5) fraudulent transfer of $275,000 against KeyBank, KeyCorp, and Donnelly, (6) *quia timet*, exoneration, and indemnity against all of the defendants, (7) breach of contract against Leahey, (8) breach of fiduciary duty on the part of all of the defendants, (9) conversion against Leahey and his wife, and (10) fraudulent transfer of approximately $140,000 against KeyBank, KeyCorp, and Donnelly.

On May 21, 1998, the defendants moved for summary judgment on all claims. In an opinion and order dated August 14, 1998, the district court granted in part and denied in part the defendants' motion. Specifically, the district court granted summary judgment to the defendants with respect to Travelers's third, fourth, and fifth claims, and denied summary judgment in all other respects. Later in August of 1998, the district court, pursuant to an agreement between the parties, dismissed Bersticker from the action. Soon thereafter, Travelers voluntarily dismissed the tenth claim.

On August 24, 1998, KeyBank, KeyCorp, and Donnelly filed a motion in limine, requesting that the court limit the testimony of Travelers's banking expert, Dr. Douglas Austin. Among other things, they contended that "because Austin lacks bonding expertise, he should not be permitted to opine on what a bonding underwriter (such as Travelers) would rely on in evaluating a bonding risk." In response to the motion, Travelers acknowledged that Dr. Austin was not a bond underwriting expert, but argued that he could still testify as to certain related matters:

> Dr. Austin does have knowledge about bond underwriting and he should not be precluded from testifying in that regard in order to explain his opinions

as to why the KeyBank defendants acted recklessly in support of the plaintiff's fraud claims.

Since Dr. Austin has acknowledged that he is not a bond underwriting expert, he will not be asked at trial to opine upon the bond underwriting activities of [Travelers]'s underwriters. Dr. Austin will not "opine on what a bonding company would rely on in underwriting a bond."

Just before trial, the district court denied the motion in limine, noting that "[f]rom the materials submitted to me, I understand that [Travelers], at this point in time, does not seek to make inquiry of Dr. Austin concerning underwriting matters . . . ." The district court made clear, however, that the denial was "subject to a later review in the context of the trial."

On August 31, 1998, the jury trial began. At the close of Travelers's case-in-chief, the district court granted Elmore's motion for judgment as a matter of law as to the conspiracy-to-commit-fraud claim. The district court also ruled, sua sponte, that there was insufficient evidence to support an award of punitive damages against any of the defendants. At the close of all of the evidence, the district court denied the defendants' renewed motions for judgment as a matter of law.

On September 8, 1998, the jury returned a verdict against Donnelly and KeyBank for aiding and abetting fraud and for conspiracy to commit fraud, and returned a verdict against Elmore for fraud, aiding and abetting fraud, and negligence. (No verdict was rendered against KeyCorp, and it appears as though that particular entity is no longer involved in this case.)

In answer to the district court's interrogatories, the jury specifically found that Donnelly had "actual knowledge" of Leahey's fraud and that Donnelly "knowingly provided substantial assistance" in furtherance of that fraud. It was unable to reach a verdict, however, as to Donnelly's and KeyBank's own alleged fraud. The jury answered

evidence from which the jury could reasonable infer that *at the time Elmore made his misrepresentations* he had the knowledge referred to above. Although Ranallo testified that Elmore knew that she was misstating LGC&M's financial statements, she did not indicate *when* Elmore became aware of her actions. In fact, Ranallo's comments were made with respect to balance sheets dated December 31, 1996, February 12, 1997, and March 31, 1997. Her testimony did not establish that Leahey was aware of any financial irregularities prior to the date he himself learned of the $275,000 loan repayment in late September of 1996.

None of the evidence cited by Travelers in support of the jury's aiding-and-abetting finding supports the conclusion that Elmore knew prior to or at the time of his misrepresentations that Leahey had engaged in tortious conduct. In fact, Elmore's act of promptly contacting Black in September of 1996 when Elmore first learned of Leahey's misrepresentation favors a finding that he *lacked* prior knowledge of Leahey's fraud. *See Camp*, 948 F.2d at 463 (noting that, faced with an aiding and abetting allegation, the defendant's lack of knowledge was demonstrated by his actions upon discovering improper conduct, which included contacting two other defendants and notifying the plaintiff's attorney). Furthermore, Elmore's decision to forego contacting Travelers directly and his failure to raise the issue with Bender at their October 14, 1996 meeting do not provide adequate evidence from which a jury could reasonably infer Elmore's prior knowledge of Leahey's fraud. As Elmore testified, he believed that "[w]hen I told Dave Black I was telling [Travelers]."

We therefore conclude that the district court erred in denying Elmore's motion for judgment as a matter of law on the aiding and abetting claim against him.

and KeyBank's motion for judgment as a matter of law on the conspiracy-to-commit-fraud claim.

### 6. *Elmore's motion for judgment as a matter of law—aiding and abetting*

Turning now to Elmore's appeal, he first challenges the district court's ruling that the evidence sufficiently established his liability for aiding and abetting Leahey. Like Donnelly and KeyBank, Elmore contends that neither the knowledge nor the substantial assistance elements was proven by the evidence at trial. Elmore's arguments essentially mirror those of Donnelly and KeyBank.

### a. Knowledge

Elmore summarizes his argument as follows: "Elmore's awareness that Leahey claimed he was borrowing money on a short term [basis] for bonding purposes was simply *not* sufficient to prove that . . . Elmore had *actual* knowledge that Leahey was defrauding Travelers." (Emphasis in original.)

As discussed previously, for the purpose of establishing aiding and abetting liability, knowledge may be shown by circumstantial evidence. *See Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985). We agree with Travelers's view that there was sufficient circumstantial evidence from which a jury could reasonably infer that at some point Elmore became aware that Leahey was engaged in tortious conduct. As Travelers notes in its brief, Ranallo, LGC&M's in-house accountant, testified that she told Elmore that she had been instructed to misrepresent the financial condition of LGC&M, and that he was therefore fully aware of that fact. Based on this testimony alone, which the jury was entitled to credit, we believe that the jury could reasonably infer that Elmore knew of Leahey's tortious conduct.

We cannot further conclude, however, that the evidence supports the jury's ultimate finding that Elmore aided and abetted in Leahey's fraud. The record is devoid of any

"$1,040,000" to the following question: "State the total amount of damages sustained by [Travelers] which you find have resulted from the fraud of . . . Donnelly or KeyBank, or that resulted from fraud by Patrick or Susan Leahey as to which . . . Donnelly or KeyBank aided or abetted." (It does not appear that the jury was presented interrogatories with respect to the allegation that Donnelly and KeyBank conspired with Leahey.) In its judgment, however, the district court declared that the jury "returned an award of damages" in the amount of $1,040,000 "on the issues of conspiracy and aiding and abetting . . . ."

With respect to the allegations of fraud on the part of Elmore, the jury found that he "had actual knowledge of important or necessary information about the Leaheys' financial condition" and that he either made a false representation to or concealed a known fact from Travelers. The jury also specifically found that Travelers had proven the elements of civil aiding and abetting with respect to Elmore. It answered "$1,560,000" to the following question: "State the total amount of damages sustained by [Travelers] which you find have resulted from the fraud of . . . Elmore, or that resulted from fraud by Patrick or Susan Leahey as to which . . . Elmore aided or abetted." In a separate section of the interrogatories, the jury found that Elmore was negligent in the performance of his duties, and that the resulting damages amounted to $1,560,000. The jury also found, however, that Travelers was contributorily negligent by thirty percent. In its judgment, the district court stated that the jury "returned an award of damages" in the amount of $1,560,000 "as to the issues of fraud, aiding and abetting, and negligence . . . ."

Travelers subsequently requested that the district court impose joint and several liability on Donnelly, KeyBank, and Elmore. These defendants, in contrast, requested judgment in their favor as a matter of law (or a new trial). The district court denied all of the post-trial motions in orders dated December 11, 1998.

On appeal, the parties challenge various rulings made by the district court during and after the trial. Donnelly, KeyBank, and Elmore assert that there was insufficient evidence to support the verdict rendered in connection with the fraud claims, including insufficient evidence to support a finding of justifiable reliance by Travelers on Leahey's misrepresentations or a causal link between the alleged fraud and Travelers's losses. (Elmore has not appealed the adverse negligence verdict.)

The parties also maintain that the district court erred by allowing certain expert testimony. Donnelly and KeyBank take issue with Travelers's banking expert, and Elmore challenges the admissibility of testimony by Travelers's fraud expert. Travelers, on the other hand, appeals the district court's (1) sua sponte ruling that there was insufficient evidence to support an award of punitive damages and (2) refusal to impose joint and several liability on the defendants. The Ohio Bankers' Association, as amicus curaie, has also filed a brief in this matter, supporting the arguments asserted by Donnelly and KeyBank.

## II. ANALYSIS

### A. The district court erred in part when it denied the defendants' motions for judgment as a matter of law

#### 1. *Standard of review*

The standard of review applicable to a district court's determinations pursuant to Rule 50 of the Federal Rules of Civil Procedure in a diversity action has been summarized by this court as follows:

> [A] federal court sitting in diversity reviews *de novo* legal determinations raised by a Rule 50 motion, and must apply the forum state's standard of review "only when a Rule 50 challenge is mounted to the sufficiency of the evidence supporting a jury's findings. No

As previously outlined, the following elements must be proven in order to establish a claim of civil conspiracy: "(1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy." *Universal Coach, Inc. v. New York City Transit Auth., Inc.*, 629 N.E.2d 28, 33 (Ohio Ct. App. 1993). The first of these elements, which is the focus of Donnelly's and KeyBank's challenge on appeal, "does not require a showing of an express agreement between defendants, but only a common understanding or design, even if tacit, to commit an unlawful act." *Gosden v. Louis*, 687 N.E.2d 481, 496 (Ohio Ct. App. 1996).

Like the knowledge requirement for the tort of aiding and abetting, the existence of an express agreement between defendants will frequently be provable only through circumstantial evidence. *See United States v. Short*, 671 F.2d 178, 182 (6th Cir. 1982) (noting, in a criminal conspiracy case, that "[t]he element of agreement . . . is nearly always established by circumstantial evidence, as conspirators seldom make records of their illegal agreements"). With respect to the level of agreement that must be established, this court has stated that "[a]ll that must be shown is that . . . the alleged coconspirator shared in the general conspiratorial objective . . . ." *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985).

Similar to their argument challenging the aiding and abetting verdict, Donnelly and KeyBank assert that "[t]he only evidence Travelers pointed to of any agreement or understanding between Key[Bank] and Leahey, other than the loan agreement itself, was Donnelly's July 24, 1996 memorandum." They further contend that "th[e] memorandum does not establish that Donnelly knew of, let alone agreed to participate, in a fraudulent scheme." Although we take issue with their statement that the memorandum was "[t]he only evidence" identified by Travelers, we agree that it was unreasonable for the jury to infer from the evidence presented that Donnelly, and therefore

deference is appropriate in diversity cases to the trial court's resolutions of legal questions."

*Palmer v. Fox Software, Inc.*, 107 F.3d 415, 418 (6th Cir. 1997) (quoting *K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 176 (6th Cir. 1996)); *see also J.C. Wyckoff & Assocs., Inc. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1482 (6th Cir. 1991) ("In federal court diversity cases, this circuit adheres to the minority rule that state law governs the standard for granting motions for directed verdicts and judgments notwithstanding the verdict.").

An appellate court reviewing a diversity action, however, "need show no deference to the *trial court's* assessment of the sufficiency of the evidence before a jury, even if state law so requires." *K & T Enters.*, 97 F.3d at 176 (emphasis in original). As will become apparent, the defendants' challenge to the district court's denial of their Rule 50 motions is "mounted to the sufficiency of the evidence" and, therefore, this court must apply Ohio's standard of review.

In Ohio, the proper standard of review of a trial court's ruling on a motion for judgment notwithstanding the verdict (now known as a motion for judgment as a matter of law in the federal courts) is as follows:

The test to be applied by a trial court in ruling on a motion for judgment notwithstanding the verdict is the same test to be applied on a motion for a directed verdict. The evidence adduced at trial and the facts established by admissions in the pleadings and in the record must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied. Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon either of the above motions.

*Posin v. A.B.C. Motor Court Hotel, Inc.*, 344 N.E.2d 334, 338 (Ohio 1976).

### 2.   Aiding and abetting fraud under Ohio law

The modern application of civil aiding and abetting can be traced to the Second Restatement of Torts: "For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he . . . knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself . . . ." RESTATEMENT (SECOND) OF TORTS § 876(b) (1979). At the outset, Donnelly, KeyBank, and Elmore question whether Section 876(b) is a recognizable cause of action under Ohio law.

As the Court of Appeals of Ohio has observed, the state's highest court "has never expressly approved Section 876 . . . ." *Andonian v. A.C. & S., Inc.*, 647 N.E.2d 190, 191 (Ohio Ct. App. 1994). Although that may be true, the Supreme Court of Ohio—as the *Andonian* court noted—has on at least one occasion applied Section 876(b). *See Great Cent. Ins. Co. v. Tobias*, 524 N.E.2d 168, 172 (Ohio 1988) (setting forth the requirements of Section 876(b) and concluding that "the theory of joint liability for the encouragement of tortious conduct adopted by the court of appeals cannot apply to appellant under these circumstances"). By applying Section 876(b) to the facts of the case before it, the *Great Central* court implicitly indicated that it considered civil aiding and abetting a viable cause of action. *See Failla v. City of Passaic*, 146 F.3d 149, 158 (3d Cir. 1998) (relying in part on a New Jersey lower court decision in finding that there is "no reason to believe that the New Jersey Supreme Court would adopt a construction of civil aiding and abetting liability under the [New Jersey Law Against Discrimination] that differs from [Section 876(b) of] the Restatement"). Accordingly, we conclude that the Supreme Court of Ohio would recognize aiding and abetting

In light of these factors, there can be little doubt that KeyBank's $275,000 loan substantially assisted Leahey in his efforts to temporarily inflate the assets of LGC&M and induce Travelers to bond LGC&M's construction projects. As discussed in Part II.A.4.a. of this opinion, Leahey's fraud consisted of the wrongful manipulation of LGC&M's financial position. By securing the $275,000 loan, Leahey was able to "verify" to Travelers that he had complied with its first funding request, thereby establishing a vital and initial level of credibility. Because this credibility served as the foundation for increased trust between the parties, we conclude that the extension of the loan was of substantial assistance to Leahey.

Donnelly and KeyBank place great emphasis on those aspects of Leahey's fraud that did not depend on the $275,000 borrowing, and argue that the loan "was not even a necessary component of Leahey's scheme." Even if one were to accept the contention that the loan was not "necessary" to the scheme, Donnelly's and KeyBank's argument would still fail. Substantial assistance, after all, does not mean *necessary* assistance. *Cf. Camp v. Dema*, 948 F.2d 455, 462 (8th Cir. 1991) (implying that the test is whether the assistance makes it "easier" for the securities violation to occur, not whether the assistance was necessary). In addition, although it is true that "the routine extension of a loan does not amount to substantial assistance," *Bane v. Sigmundr Exploration Corp.*, 848 F.2d 579, 582 (5th Cir. 1988), the loan at issue in this case was, as previously discussed, anything but routine.

### 5.   Donnelly's and KeyBank's motion for judgment as a matter of law—conspiracy

Donnelly and KeyBank further maintain that the district court erred when it denied their motion for judgment as a matter of law on Travelers's civil conspiracy claim. They contend that "there was no evidence that Key[Bank] had an agreement or understanding with Leahey to defraud Travelers . . . ." On this issue, we agree with their argument.

circumstantial evidence, or by reckless conduct, but the proof must demonstrate actual awareness of the party's role in the fraudulent scheme.").

### b.   Substantial assistance

Donnelly and KeyBank also take issue with the jury's finding that they had provided substantial assistance to Leahey.  They assert that "Leahey did not need a loan from Key[Bank] to deceive Travelers; he could easily have defrauded Travelers without borrowing money from Key[Bank]."   Again, we find Donnelly's and KeyBank's argument unpersuasive.

As previously noted, in order to establish aiding and abetting liability, a plaintiff must prove that the defendant provided "substantial assistance or encouragement to the primary party in carrying out the tortious act." *Andonian*, 647 N.E.2d at 192.  "Establishing this element . . . requires the plaintiff to show that the secondary party proximately caused the violation, or, in other words, that the encouragement or assistance was a substantial factor in causing the tort." *K&S Partnership*, 952 F.2d at 979.   With respect to this determination, the Third Circuit has explained as follows:

> [T]he comments to section 876 of the Restatement provide a list of five factors: "the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other and his state of mind." Additionally, the court in *Halberstam* provided a sixth factor, the duration of the assistance provided.  Finally, the alleged substantial assistance must be the proximate cause of plaintiffs' harm.

*Temporomandibular Joint (TMJ) Implant Recipients v. Dow Chem. Co.*, 113 F.3d 1484, 1495 (8th Cir. 1997) (citations omitted).

liability if squarely faced with the issue, and we therefore decline Travelers's invitation to certify the state law question.

"Section 876(b) requires two elements: (1) knowledge that the primary party's conduct is a breach of duty and (2) substantial assistance or encouragement to the primary party in carrying out the tortious act." *Andonian*, 647 N.E.2d at 191-92; *see also Failla*, 146 F.3d at 158 ("Courts have recognized that . . . Restatement [Section 876(b)] sets forth the standard for civil aiding and abetting liability."). Notwithstanding this clear pronouncement by an Ohio court of the relevant elements, Travelers contends that "[a]ctual knowledge is not required to establish aiding and abetting liability . . . ."  In support of this proposition, Travelers cites, among other things, the following passage from this court's decision in *Securities & Exchange Commission v. Coffey*, 493 F.2d 1304 (6th Cir. 1974):

> Aiding and abetting has been defined by the courts considering securities law cases with reference to both the Restatement of Torts, 876 (1939), and the criminal law, 18 U.S.C. § 2 (1969).  Without meaning to set forth an inflexible definition of aiding and abetting, we find that a person may be held as an aider and abettor only if some other party has committed a securities law violation, *if the accused party had general awareness that his role was a part of an overall activity that is improper*, and if the accused aider-abettor knowingly and substantially assisted the violation.

*Id.* at 1316 (emphasis added).

Other courts have similarly referenced Section 876 and then concluded that evidence of a "general awareness of a role in an improper activity" will satisfy the first element of an aiding and abetting claim.  *See, e.g.*, *Temporomandibular Joint (TMJ) Implant Recipients v. Dow Chem. Co.*, 113 F.3d 1484, 1495 (8th Cir. 1997) (acknowledging that liability under Section 876(b) will attach when the actor "knows that the

other's conduct constitutes a breach of duty," but also noting that "[c]ourts have recognized" the requirement that "the aider and abettor must be generally aware of his role in the overall wrongful activity at the time assistance is provided").

We see no conflict between the position that an aider and abettor must have actual knowledge of the primary party's wrongdoing and the statement that it is enough for the aider and abettor to have a general awareness of its role in the other's tortious conduct for liability to attach. *See Camp v. Dema*, 948 F.2d 455, 460 (8th Cir. 1991) ("If a defendant has a general awareness of his role in the primary violator's wrongful activity, however, this may be sufficient to satisfy the knowledge requirement."). If one is aware that he has a role in an improper activity, *see Coffey*, 493 F.2d at 1316, then surely he knows that the primary party's conduct is tortious, *see Andonian*, 647 N.E.2d at 191-92.

### 3.   *Conspiracy to commit fraud under Ohio law*

The Supreme Court of Ohio defines civil conspiracy as "'a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages.'" *Kenty v. Transamerica Premium Ins. Co.*, 650 N.E.2d 863, 868 (Ohio 1995) (quoting *LeFort v. Century 21-Maitland Realty Co.*, 512 N.E.2d 640, 645 (Ohio 1987)). Thus, in order to establish a claim of civil conspiracy, the following elements must be proven: "(1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy." *Universal Coach, Inc. v. New York City Transit Auth., Inc.*, 629 N.E.2d 28, 33 (Ohio Ct. App. 1993).

The District of Columbia Circuit has succinctly identified the following difference between the torts of conspiracy to commit fraud and aiding and abetting fraud: "The prime distinction between civil conspiracies and aiding-abetting is that a conspiracy involves an agreement to participate in a

about Leahey's subordination agreement," and that neither Travelers nor Elmore ever "inform[ed] Key[Bank] that Travelers was relying on the $275,000 as a long-term capital contribution" to LGC&M. An alleged aider and abettor, however, need not know all of the details of the primary party's scheme for liability to attach. *See, e.g.*, *Woods v. Barnett Bank of Fort Lauderdale*, 765 F.2d 1004, 1012 (11th Cir. 1985) (holding that the knowledge requirement of aiding and abetting element was met, even though the bank "may not have known of all the details of the primary fraud—the misrepresentations, omissions, and other fraudulent practices").

Our conclusion with respect to Donnelly's and KeyBank's knowledge should not be misunderstood. Ordinarily, a bank does not have an obligation to investigate or question its customers' facially legal transactions. *See Smith v. American Nat'l Bank & Trust Co.*, 982 F.2d 936, 944 (6th Cir. 1992) ("The fact that the bank was in the business of lending money did not subject it to any special duty of disclosure. A lending institution has no duty to disclose based on its role as a lender."). A bank, however, is not immune from civil aiding and abetting claims, and to the extent that its knowledge of the primary party's tortious conduct can be proven, either by direct or circumstantial evidence, liability will attach if the other elements are present.

We stress that the requirement is *actual* knowledge (which, again, may be proven by circumstantial evidence), and therefore evidence establishing negligence, i.e., that a bank "should have known," will not suffice. *See Camp v. Dema*, 948 F.2d 455, 459 (8th Cir. 1991) ("[A] bare inference that the defendant 'must have had' knowledge of the primary violation is insufficient. Some knowledge must be shown, but the exact level necessary for liability remains flexible and must be decided on a case-by-case basis. Negligence, however, is never sufficient.") (citation and internal quotation marks omitted); *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 96 (5th Cir. 1975) ("Knowledge may be shown by

to believe that, as a bank officer who had previously processed loans for bonding purposes, he knew enough to realize that adding significant funds to a company's bank account for only a four-day period would not serve to meet a bonding company's capitalization requirements. This is especially true in light of the fact that, in this situation, Leahey stressed to Donnelly that the funds would have "to be there" at month-end, but would likely be returned to KeyBank immediately thereafter.

In further support of their position, Donnelly and KeyBank argue that (1) the loan "was a lawful transaction," (2) "short-term loans are 'commonplace,'" and (3) "there is nothing unusual or improper about borrowing for bonding purposes." We do not take issue with any of these individual statements. When considered in context, however, otherwise legitimate conduct can give rise to a negative inference. *See Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985) (reversing the district court's grant of summary judgment in favor of a bank accused of assisting with a customer's fraud, concluding that "[a]lthough the facts . . . are unremarkable taken in isolation, we find that taken together, they present what should have been a jury issue on the question of aiding-and-abetting liability").

Moreover, although short-term lending may be "commonplace," the details of this particular loan (e.g., its four-day duration straddling the July 1996 month end) were highly unusual. *See Camp v. Dema*, 948 F.2d 455, 459 (8th Cir. 1991) ("A party who engages in atypical business transactions . . . , may be found liable as an aider and abettor with a minimal showing of knowledge."); *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 97 (5th Cir. 1975) ("[I]f the method or transaction is atypical . . . , it may be possible to infer the knowledge necessary for aiding and abetting liability.").

Donnelly and KeyBank also assert that "there was no evidence that Donnelly or anyone else at Key[Bank] knew

---

wrongful activity. Aiding-abetting focuses on whether a defendant knowingly gave 'substantial assistance' to someone who performed wrongful conduct, not on whether the defendant *agreed to join in* the wrongful conduct." *Halberstam v. Welch*, 705 F.2d 472, 478 (D.C. Cir. 1983) (emphasis added). *But see K & S Partnership v. Continental Bank, N.A.*, 952 F.2d 971, 980 (8th Cir. 1991) ("[L]iability for civil conspiracy is in substance the same thing as aiding and abetting liability."). Under either tort, however, the defendant's knowledge is of paramount importance:

> "If it is assumed that an illegal scheme existed and that the bank's loan or other activity provided assistance to that scheme, some remaining distinguishing factor must be found in order to prevent such automatic liability. The bank's knowledge of the illegal scheme at the time it loaned the money or agreed to loan the money provides that additional factor. *Knowledge of wrongful purpose thus becomes a crucial element in aiding and abetting or conspiracy cases*."

*Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 96 (5th Cir. 1975) (emphasis added) (quoting Ruder, *Multiple Defendants in Securities Law: Aiding and Abetting, Conspiracies, In Pari Delicto, Indemnification, and Contribution*, 120 U. PA. L. REV. 597, 630-31 (1972)).

### 4. *Donnelly's and KeyBank's motion for judgment as a matter of law—aiding and abetting*

In their appeal, Donnelly and KeyBank argue that the evidence was insufficient to establish liability for civil aiding and abetting. Specifically, they contend that (1) the evidence did not show that Donnelly or any other KeyBank representative knew of Leahey's fraud, and (2) KeyBank's loan did not provide Leahey with substantial assistance in carrying out his scheme. We will address each argument in turn, "[m]indful of the potentially devastating impact aiding and abetting liability might have on commercial

relationships[.]" *Woods v. Barnett Bank of Fort Lauderdale*, 765 F.2d 1004, 1009 (11th Cir. 1985).

### a. Knowledge

"If an illegal scheme exists and a bank's loan assists in that scheme, the bank's knowledge of the scheme is the crucial element that prevents it from suffering automatic liability for the conduct of insiders to whom it loaned the money." *K&S Partnership v. Continental Bank, N.A.*, 952 F.2d 971, 977 (8th Cir. 1991) (citing *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 96 (5th Cir. 1975)). "[T]he exact level [of knowledge] necessary for liability remains flexible and must be decided on a case-by-case basis." *Camp v. Dema*, 948 F.2d 455, 459 (8th Cir. 1991). Donnelly and KeyBank assert that "there was no competent evidence that Key[Bank] knew that Leahey intended to commit fraud." We disagree.

In support of their argument, Donnelly and KeyBank claim that Leahey's fraud "consisted of [his] representations that he had subordinated to Travelers his right to repayment of a $275,000 loan that had already been paid." This defines the scope of Leahey's fraud much too narrowly. The evidence at trial established that Leahey set in motion his fraudulent plan because Travelers was troubled by LGC&M's low level of capitalization. In order to alleviate these concerns, Leahey had to add monies to LGC&M. Although Travelers also requested that Leahey subordinate his rights to these funds, this feature was of secondary importance. The primary objective was to ensure that LGC&M was adequately capitalized.

This objective was purportedly realized when an additional $275,000 was placed on the books of LGC&M as of July 31, 1996. Thus, the fraud did not simply consist of representations regarding the validity of a subordination agreement. Rather, Leahey's tortious conduct is more appropriately described as the wrongful manipulation of LGC&M's financial position for the purpose of inducing

Travelers to agree to bond the company's construction projects. Central to that manipulation was Donnelly's and KeyBank's four-day loan. At a minimum, it permitted Leahey to provide Travelers with a July 31, 1996 bank statement showing that $275,000 had been added to LGC&M's accounts.

For the purposes of establishing aiding and abetting liability, "[t]he requisite intent and knowledge may be shown by circumstantial evidence." *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985); *see also Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978) ("Proof of a defendant's knowledge or intent will often be inferential[.]"). We agree with Travelers's contention that there was sufficient circumstantial evidence from which a jury could reasonably infer that Donnelly and KeyBank knew that Leahey was engaging in tortious conduct. First, Donnelly acknowledged during trial that he and Leahey had known each other since 1991, and that on several occasions he had assisted Leahey with loans for bonding purposes. Second, as early as February 22, 1996, Donnelly understood that Leahey's entrance into commercial construction would "require[] special bonding" and that, as a result, Leahey had been "putting funds into the business." Third, KeyBank's own documents reveal that, on or before July 8, 1996, it was informed by Leahey that the purpose of the $275,000 loan was "to obtain approval from a new Bonding Company." Fourth, the July 24, 1996 memorandum sets forth Donnelly's understanding that Leahey requested "these funds to be there at month-end." Fifth, the memorandum reveals that even though the loan was classified as a thirty-day agreement, Leahey intended to repay it just two days after the July 1996 month-end.

Given this evidence, we cannot say that it was unreasonable for the jury to infer that Donnelly and KeyBank knew that Leahey was engaging in tortious conduct. Although it may well be true that Donnelly did not have a full understanding of the bonding business, it was not unreasonable for the jury